UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STRIDE RITE CORPORATION,<br><br>Plaintiff(s),<br><br>v.<br><br>VEROTIX SYSTEMS, INC.,<br><br>Defendant(s). | Civil Action No.<br><br>**05 CA 12575 MEL** |

## COMPLAINT

This is a declaratory judgment action brought under 28 U.S.C. § 2201 by Plaintiff Stride Rite Corporation ("Stride Rite") against Defendant Verotix Systems, Inc. ("Verotix") seeking a declaration that the Verotix Software Licensing Agreement is not enforceable against Stride Rite and that Stride Rite does not owe Verotix *any* money under *any* contract that governs the relationship between the parties.

RECEIPT # 69111
AMOUNT $ 250.00
SUMMONS ISSUED 1
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK. MP
DATE 12/22/2005

MAGISTRATE JUDGE JGD

**Parties**

1. Plaintiff Stride Rite is a Massachusetts corporation with a principal place of business at 191 Spring Street, Lexington, Massachusetts 02421. Stride Rite has several wholly owned subsidiaries including the Stride Rite Children's Group, Inc. and Keds.

2. Stride Rite is a leading marketer of high quality footwear. Stride Rite markets footwear under the following owned or licensed brands: Stride Rite, Keds, Pro-Keds, Grasshoppers, Sperry Top-Sider, Tommy Hilfiger, Saucony, and Spot-bilt.

3. Defendant Verotix Systems, Inc. ("Verotix") is an Illinois corporation with a principal place of business at 14652 S. Saddle Brooke Lane, Homer Glen, Illinois 60491.

4. Verotix is in the business of providing goods and services in, among other areas, the supply chain management and order process management industry.

**Jurisdiction and Venue**

5. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000. Verotix has accused Stride Rite of breaching the Verotix Software Licensing Agreement ("the Verotix License Agreement") and demands that Stride Rite pay Verotix more than $2 million in damages.

6. This Court has personal jurisdiction over Verotix under Mass. Gen. Laws ch. 223A, § 3(a) because Verotix has transacted business within the Commonwealth of Massachusetts. Jurisdiction is also proper as Verotix has established the necessary minimum contacts with the Commonwealth of Massachusetts such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

7. This Court is a proper venue for this action under 28 U.S.C. §1391.

## Facts

### History of the Stride Rite – Verotix Relationship

8. To fulfill orders placed by various retail and wholesale customers, Stride Rite maintains two distribution centers that serve as the point of origin for product supply to retailers across the country. One distribution center is located in Louisville, Kentucky (the "Louisville Distribution Center") and the other distribution center is located in Huntington, Indiana (the "Huntington Distribution Center") (collectively the "Distribution Centers").

9. The Distribution Centers include large warehouse space where thousands of pieces of product are stored. The Distribution Centers utilize custom-built hardware and software systems to sort and prepare shipments. During the order fulfillment process, product is "picked" from storage areas using a dedicated software system. Once "picked," product flows from the storage areas on custom-built conveyor racking systems to collection areas to await shipment.

10. Stride Rite first developed the Louisville Distribution Center in 1993 and hired a general contractor to complete the work.

11. The general contractor subcontracted out different aspects of the work, and one of the subcontractors hired for the job was Verotix. Verotix was put in charge of certain aspects of the Louisville Distribution Center build-out. Specifically, Verotix supplied the conveyor control system otherwise known as Ladder Logic and the engineering drawings required for the job.

12. In 1996, Stride Rite engaged Verotix directly to work on the Louisville Distribution Center. Specifically, Verotix was engaged to overhaul the Warehouse Control

System ("WCS"). The WCS is a software system that controls the product flow through the warehouse and tracks the product as it moves throughout the conveyor systems.

13.  During the Summer of 1996, Stride Rite and Verotix President Mr. Peter Polak entered into contract negotiations for the Verotix WCS engagement. Ultimately, on August 26, 1996, Stride Rite and Verotix executed a multi-page contract that embodied the terms and conditions of the WCS engagement (the "1996 Contract") (attached hereto as Exhibit A). Included in the 1996 Contract were, among other provisions, terms capturing the scope of work to be performed by Verotix and the consideration that Stride Rite would pay Verotix for the work.

14.  The 1996 Contract also contained a provision that described which entity (Stride Rite or Verotix) would own the goods that were produced by Verotix under the engagement. Specifically, Section 2(e) of the 1996 Contract provided "[u]pon full payments by Keds [a wholly owned subsidiary of Stride Rite], Verotix shall deliver duly executed warranty bills of sale to Keds which shall vest full title in all personal property supplied by Verotix hereunder. Any ownership documents on the foregoing (e.g., certificates of title) shall be transferred and delivered to Keds at the same time" (hereafter the "Title Provision").

15.  In addition to the Title Provision, the 1996 Contract contained an integration clause that required any subsequent modifications to the contract be in writing and signed by both parties. Specifically, Section 17 of the 1996 Contract provided, "[t]he terms of this Agreement may only be changed by a writing signed by the parties hereto. Nevertheless, acknowledgement by either party on the other party's standard forms containing terms and conditions differing from or in addition to those set forth herein shall not indicate any intention

to vary, add to or detract the terms and conditions herein unless such consent is clearly expressed in documents other than such standard forms" (hereafter the "Integration Clause").

16. Stride Rite upheld its obligations under the 1996 contract and paid Verotix approximately $177,712.00 for the work performed and the goods installed in the Louisville Distribution Center. These payments were made in several installments and were all issued from Stride Rite's corporate headquarters in Lexington, Massachusetts.

17. In 1997, Stride Rite expanded its operations and opened an additional distribution center. This new facility was located in Huntington, Indiana.

18. To build-out the Huntington Distribution Center, Stride Rite engaged a general contractor and Verotix was subsequently engaged by the general contractor as a subcontractor and assigned responsibility for a major portion of the work on the Huntington Distribution Center. Specifically, Verotix was put in charge of the Ladder Logic, engineering drawings, and the WCS.

19. In 2000, Stride Rite sought to expand the Huntington Distribution Center. On this occasion, Stride Rite contracted directly with Verotix. In the Spring of 2000, the parties entered contract negotiations and ultimately executed a multi-page agreement on March 21, 2000 (the "2000 Contract")(attached hereto as Exhibit B).

20. Like the 1996 Contract, the 2000 Contract contained a provision that described which entity would own the goods that were produced by Verotix under the engagement. Specifically, Section 2(f) of the 2000 Contract provided "[u]pon full payments by SRCG [Stride Rite Children's Group], Verotix shall deliver duly executed warranty bills of sale to SRCG which shall vest full title in all personal property supplied by Verotix hereunder. Any ownership documents on the foregoing (e.g., certificates of title) shall be transferred and delivered to SRCG

at the same time." Indeed, save a change in name from one Stride Rite subsidiary to another, this language is identical to the Title Provision of the 1996 Contract.

21. In addition to the Title Provision, the 2000 Contract contained an integration clause requiring any subsequent modifications to the contract be in writing and signed by both parties. Specifically, Section 17 of the 2000 Contract provided, "[t]he terms of this Agreement may only be changed by a writing signed by the parties hereto. Nevertheless, acknowledgement by either party on the other party's standard forms containing terms and conditions differing from or in addition to those set forth herein shall not indicate any intention to vary, add to or detract the terms and conditions herein unless such consent is clearly expressed in documents other than such standard forms." Like the Title Provision, this provision is identical to the Integration Clause of the 1996 Contract.

22. Stride Rite upheld its obligations under the 2000 Contract and paid Verotix approximately $741,268.00 for the work that Verotix performed and the goods it delivered. As with the 1996 Contract, the amounts were paid in installments all of which were issued from Stride Rite's corporate headquarters in Massachusetts.

**The Verotix License Agreement**

23. Since 1993, Verotix performed annual maintenance on the hardware and systems it installed in the Distributions Centers. Prior to 1996, Verotix did not charge for this maintenance work. Beginning in or around 1996, however, Verotix began charging Stride Rite for the maintenance work. Verotix submitted maintenance agreements that governed the terms and conditions under which Verotix performed the required system maintenance.

24. Beginning in 2003, Verotix added to the maintenance agreement another document – the Verotix License Agreement. A copy of the Verotix License Agreement is

attached hereto as Exhibit C. The Verotix License Agreement is a preprinted two page boilerplate form that was never negotiated between the Parties. The Verotix License Agreement was never executed or otherwise agreed to by any Stride Rite authorized representative. To Stride Rite's knowledge Verotix never asserted any software license agreement – much less the Verotix License Agreement – until 2003.

### Retrofit and RFQs

25. In 2005, Stride Rite information technology executives determined that the current operating systems deployed at the Distribution Centers were in need of overhaul. In connection with this decision, Stride Rite developed a specification for the work to be performed. This process included the description of the current state of the existing hardware and software systems deployed at the Distribution Centers. To accurately describe the current state of the Distribution Centers' operating systems, Stride Rite gathered, among other things, existing drawings and other documentation that had been provided by various vendors/suppliers that had worked on the Distribution Centers over time.

26. Among the documentation collected in the above-described effort were certain documents provided by Verotix. These documents included certain shop drawings as well as documentation describing the format of the WCS and Ladder Logic systems. According to Stride Rite personnel that were dedicated to the retrofit operation, the documentation provided by Verotix over time was not the product of Verotix work alone. Rather, nearly all of the documentation provided by Verotix (including the engineering drawings) were materials that had numerous authors (input coming from various other vendors/suppliers and still other input coming from Stride Rite itself). This documentation was subsequently "co-opted" by Verotix and, in some instances, incorrectly labeled proprietary and confidential.

27.     Once the specification for the overhaul project was completed and the documents reflecting the existing state of the Distribution Centers collected, Stride Rite developed a request for quote document (the "RFQ") that would be distributed to potential vendors who would bid on the contract to perform the retrofit work on the Distribution Centers.

28.     In developing the list of potential bidders, Stride Rite contacted a number of companies, including Verotix, to determine their interest in bidding for the project. After the bidders were identified, Stride Rite entered into non-disclosure agreements with each bidder prior to the distribution of the RFQ package. Indeed Verotix, being a bidder on the project, also executed a non-disclosure agreement prior to receipt of the RFQ. A copy of the non-disclosure agreement that Verotix signed is attached as Exhibit D.

29.     After the companies returned the signed non-disclosure agreements, Stride Rite forwarded the RFQ.

30.     After reviewing the quotes under specific internal parameters and criteria, Stride Rite chose two different companies to share the Distribution Center retrofit work. Although Verotix submitted a proposal, it was not one of the companies selected, and during the Summer of 2005, Stride Rite notified Verotix that it was not one of the winning bidders

### The Dispute Between the Parties

31.     Disappointed that Verotix had not been selected as one of the winning bidders, Verotix President Peter Polak accused Stride Rite of improperly disclosing Verotix confidential information to third parties when it distributed the RFQ.

32.     Beginning in July of 2005, Mr. Polak accused Stride Rite of violating the Verotix License Agreement by sending out the RFQ. Specifically, Mr. Polak claimed that certain

mentions of the Stride Rite warehouse setup violated the nondisclosure clause of the Verotix License Agreement.

33.   In an effort to resolve the dispute, Stride Rite information technology executives attempted to alleviate Mr. Polak's objections. To this end, Stride Rite personnel met on several occasions with Mr. Polak to hear his complaints and suggest a compromise. Indeed, Stride Rite indicated that although it believed strongly that no confidential information was disclosed and that no breach of the Verotix License Agreement occurred (in fact, Stride Rite was not even aware of the existence of the Verotix License Agreement nor did it ever agree to its terms) it was willing to settle this matter and made good faith efforts to end the dispute. Verotix, through Mr. Polak rebuffed Stride Rite's settlement offers and insisted that the one-sided, unexecuted Verotix License Agreement's liquidated damages clause was the appropriate measure of damages owed to Verotix.

### Verotix's Demand Under the Verotix License Agreement

34.   Notwithstanding Verotix's unreasonable demands for payment, Stride Rite continued to negotiate in an effort to resolve the matter. In fact, at one point in the Fall of 2005, Stride Rite and Mr. Polak had come to an agreement in principal to resolve the dispute. Although Stride Rite believed, and continues to maintain, that it owes Verotix nothing, Stride Rite made a business decision that payment of some token amount was justifiable to bring closure to the matter. Unfortunately, Verotix walked away from the agreement in principal. Instead of the negotiated amount, Verotix demanded exorbitant amounts under the Term and Termination clause of the Verotix License Agreement. Specifically, Verotix claimed that the disclosure of information to third parties (third parties that signed a non-disclosure agreement) triggered the termination of the Verotix License Agreement and, as a material breach of that

agreement, Verotix was entitled to: (1) a reinstatement fee of $200,000 per server; and (2) a per diem non-compliance fee of $10,000 per day. The exact language of the clause states: "Reinstatement of the PRODUCT license after material breach of the Agreement shall comprise a re-instatement fee of $200,000.00 per server plus payment of any and all past unpaid fees. If the Licensee continues to use the PRODUCT in violation of the Agreement, the Licensee agrees to a $10,000.00 usage fee per day for each day of violation" (hereafter the "Penalty Provisions"). Indeed, as of November 7, 2005, as damages for the alleged disclosure of certain engineering drawings and other documentation, Verotix was demanding that Stride Rite pay $2,960,000.00 in damages.

35.   Stride Rite maintains that the Verotix License Agreement does not govern the relationship between the parties. Rather, Stride Rite points to the two multi-page, negotiated and executed contracts as the controlling agreements. Specifically, Stride Rite's position is that once it made full payment for all work performed by Verotix under the 1996 Contract and the 2000 Contract, title to all the Verotix product – including hardware, software, and documentation -- passed to Stride Rite and Stride Rite was free to treat the documents in any fashion it saw fit. Alternatively, Stride Rite believes that even if the Verotix License Agreement plays some role in the parties relationship, the distribution of the RFQ did not amount to a material breach of the Verotix License Agreement and that the Penalty Provisions of the Verotix License Agreement do not accurately reflect the harm (if any) suffered by Verotix as a result of Stride Rite's conduct. Simply stated, Verotix can show no damage as a result of Stride Rite's alleged breach of the Verotix Licensing Agreement. Even if Verotix can show some damage, it is not close to the $2.96 million that Verotix demands.

36. When Stride Rite questioned the existence of the Verotix License Agreement and its status as an enforceable contract between the parties, Verotix claimed that the license agreement had been incorporated into their Operations Manual dating back to 1993 and had been added as part of the maintenance agreement in 2003. Stride Rite has no record of receiving an Operations Manual, much less one that included the Verotix License Agreement.

37. Verotix claims that Stride Rite agreed to the terms of the Verotix License Agreement by installing and using the software provided, even though the two signed contracts expressly state that a change in the terms of the agreement can only be accomplished through a signed writing; and, notwithstanding the fact that Stride Rite had already installed the Verotix software <u>prior to ever receiving</u> the Verotix License Agreement.

38. Although Stride Rite has continued its attempts to negotiate a resolution of this matter, Verotix remains intractable and has threatened to sue Stride Rite and seek an injunction effectively shuttering the operation of Stride Rite's Distribution Centers. These threats represent a serious risk exposure to Stride Rite's business and, accordingly, it seeks the aid of this Court to declare the Verotix License Agreement unenforceable.

## COUNT I

### (Declaratory Judgment)

39. An actual controversy exists between the parties as to whether Stride Rite owes Verotix any money under any contract. Verotix claims that Stride Rite owes Verotix almost $3 million in damages for violation of the Verotix License Agreement, a document that Stride Rite believes it never agreed to – much less had notice of until 2003. In a November 7, 2005 letter from Verotix to Stride Rite, Mr. Polak threatened that if Stride Rite does not pay, Verotix will be forced to seek "formal injunctive remedies."

40. An actual controversy exists between the parties as to whether the Verotix License Agreement is an enforceable contract. Stride Rite and Verotix have executed two separate multi-page contracts that were negotiated by the parties. The negotiated, signed contracts govern the relationship between the parties; not a one-sided, hidden document that was never signed by Stride Rite and was not known to Stride Rite until 2003.

41. An actual controversy exists between the parties as to whether Stride Rite has materially breached the Verotix License Agreement if such document is found to be enforceable. None of the material contained in the RFQ can be considered confidential proprietary Verotix information. No improper disclosure occurred. Although Verotix claims that such conduct resulted in harm to Verotix, Verotix has failed to offer any evidence of such damages. Instead, Verotix simply points to the Penalty Provisions of the Verotix License Agreement as the legitimate basis for its claim of nearly $3 million in damages from Stride Rite and the right to enjoin the operations of Stride Rite's Distribution Centers.

42. In truth, Verotix is simply disappointed that it was not selected as the vendor to perform the retrofit project at the Distribution Centers and is now attempting to exert leverage over Stride Rite.

43. In summary, Verotix is a disgruntled vendor attempting to "hold-up" Stride Rite for payment. Dissatisfied with the millions of dollars that Stride Rite has paid Verotix over the course of its relationship, Verotix now claims to be owed more and points to a document that was never agreed to by Stride Rite and which runs counter to the existing contracts that govern the parties' relationship.

## Prayer For Relief

Wherefore, the plaintiff prays for the following relief:

A. Stride Rite seeks a declaration from the Court that it owes no money to Verotix under any contract between the parties;

B. Stride Rite seeks a declaration from the Court that the Verotix License Agreement is not an enforceable contract between the parties;

C. Stride Rite seeks a declaration from the Court that even if the Verotix License Agreement is found to be enforceable, Stride Rite has not committed a material breach of such agreement;

D. Stride Rite seeks a declaration from the Court that even if the Verotix License Agreement is enforceable and that Stride Rite materially breached the terms, the Penalty Provisions of the Verotix License Agreement are not an accurate reflection of the damage Verotix suffered and are therefore unenforceable; and

E. Stride Rite asks the Court to grant such other relief that the Court deems just and proper.

Dated: December 22, 2005

Michael H. Bunis (BBO # 566839)
Michael S. Forman (BBO # Pending)
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, MA 02110
(617) 542-5070 Telephone
(617) 542-8906 Facsimile

*Attorneys for the Plaintiff*